# UNITED STATES DISTRICT COURT
for the
DISTRICT OF KANSAS

TROY D. RENKEMEYER, HUSBAND AND WIFE AS JOINT TENANTS,

and

SUSAN M. RENKEMEYER, HUSBAND AND WIFE AS JOINT TENANTS

Plaintiff

v.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

and

CENTRAL LOAN ADMINISTRATION & REPORTING,

Defendants

Civil Action No. 10-CV-2415 JWL/DWB

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

COME NOW Plaintiffs Troy D. Renkemeyer and Susan M. Renkemeyer ("Plaintiffs"), pursuant to Federal Rule of Civil Procedure 56, and in support of their Motion for Summary Judgment, states as follow:

## I. INTRODUCTION

This case is about whether a mortgage purporting to secure a debt is an effective mortgage document. Plaintiffs contend that <u>either</u> of two separate and independent defects in the mortgage document cause the mortgage to be ineffective as an instrument providing a security interest securing the debt it purports to secure. This case is <u>not</u> about

the legitimacy of the debt itself or the obligations of Plaintiff to the holder of the debt. In fact, Plaintiff has always been current on the amounts owed pursuant to the debt, and remains current today. *See* the Affidavit of Susan M. Renkemeyer attached hereto as Exhibit D. This case is solely about whether the mortgage instrument effectively provides a security interest to the lender, securing the debt in question.

Plaintiffs allege the two defects in the mortgage are:

(a) The mortgage grants a security interest to Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") and not to the lender, while only the lender (or its assigns) holds the debt in question. As such, the mortgage was bifurcated from the debt which causes the mortgage to be ineffective.

(b) The mortgage describes the debt for which it secures as the debt obligation related to that certain promissory note issued by "Troy D. Renkemeyer and Susan Renkemeyer Husband and Wife as Joint Tenants." No such promissory note exists. The mortgage fails to describe the debt.

## II. STATEMENT OF UNCONTROVERTED FACTS

1. Troy Renkemeyer (and not Troy D. Renkemeyer and Susan Renkemeyer Husband and Wife as Joint Tenants) executed the Interest-Only Period Adjustable Rate Note dated March 23, 2007 in favor of Peoples Bank, a Kansas Corporation (the "Note"). *See* **Exhibit A** attached hereto and Paragraph 2 of the Answer of Defendant Central Loan Administration & Reporting ("Cenlar").
2. The servicer rights of Lender have been assigned to Defendant Cenlar. *See* Paragraph 3 of Defendant Cenlar's Answer.

3. As the Servicer of the Note, Cenlar is the agent of the noteholder responsible for enforcing and defending the rights of the noteholder. See correspondence from Cenlar attached hereto as **Exhibit B**.

4. Plaintiff executed a Mortgage dated March 23, 2007 in favor of Peoples Bank (the "Mortgage"). *See* **Exhibit C** attached hereto.

5. Page 2 of the Mortgage provides that:

> This Security Instrument secures to Lender: (1) the repayment of the Loan and all renewals, extensions and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower mortgages and warrants to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property....

*See* the Mortgage attached hereto as Exhibit C.

6. The term "Lender" is defined by Page 1 of the Mortgage, Paragraph (D) as Peoples Bank. *See* the Mortgage attached hereto as Exhibit C.

7. The Note has been assigned one or more times to the current holder of the Note, for whom Cenlar services the Note. *See* Paragraph 3 of Cenlar's Answer.

8. MERS is defined on Page 1 of the Mortgage, Paragraph (C) as the Defendant "Mortgage Electronic Registration Systems, Inc. *See* the Mortgage attached hereto as Exhibit C.

9. Page 2, item (G) of the Mortgage defines the term "Loan" as "the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest." *See* the Mortgage attached hereto as Exhibit C.

10. Page 1, item (E) of the Mortgage defines the term "Note" as "the promissory note

signed by Borrower and dated March 23, 2007." *See* the Mortgage attached hereto as Exhibit C.

11. MERS holds legal title only to the Mortgage. *See* the Mortgage attached hereto as Exhibit C. *See generally* MERS Opposition to Plaintiffs Notice of Dismissal Without Prejudice.

12. Page 1, item (B) of the Mortgage defines the term "Borrower" as "Troy D. Renkemeyer and Susan Renkemeyer Husband and Wife as Joint Tenants." *See* the Mortgage attached hereto as Exhibit C.

13. The entire portion of the definition of Borrower in the Mortgage, other than "Troy D. Renkemeyer and Susan Renkemeyer Husband and Wife as Joint Tenants" is in pre-printed text while the portion quoted is typewritten into the document. *See* the Mortgage attached hereto as Exhibit C.

14. Although a promissory note was executed by "Troy Renkemeyer" on March 23, 2007, no promissory note was executed by "Troy D. Renkemeyer and Susan Renkemeyer Husband and Wife as Joint Tenants" dated March 23, 2007. *See* Affidavit of Susan M. Renkemeyer attached hereto as **Exhibits D**.

15. Paragraph 23 of the Mortgage provides that the holder of the Mortgage must release the Mortgage once the debt it purports to secure is gone. *See* the Mortgage attached hereto as Exhibit C.

16. K.S.A. 58-2309a requires a mortgagee to file a satisfaction of mortgage when no debt remains for which the mortgage secures.

17. There is no reference to MERS in the Note. *See generally* Exhibit A.

18. The Mortgage and Note were drafted by the lender defined in the Mortgage. *See*

Exhibit D.

## III. QUESTIONS PRESENTED

1. Whether the Mortgage is unenforceable by the holder of the Note, or any other party, as an instrument granting a security interest in the property referenced in the Mortgage to secure the Note because the security interest was granted to MERS, a party that is not the holder of the Note.
2. Whether the Mortgage is unenforceable by the holder of the Note, or any other party, as an instrument granting a security interest in the property referenced in the Mortgage to secure the Note because the Mortgage fails to identity the debt that it purports to secure.

## IV. ARGUMENTS AND AUTHORITY

### A. Summary Judgment Standard

Summary judgment is appropriate when the movant can demonstrate that the pleadings, depositions, affidavits, and other evidence available to the court establish no genuine issue of material fact. Fed. R. Civ. P. 56(c). Once the movant has met its burden, the non-movant must demonstrate that there are fact issues warranting a trial. Fed. R. Civ. P. 56(e). In opposing summary judgment, the nonmoving party may not rely on conclusory allegations in his pleadings; rather, he must set forth sufficient evidence supporting a claimed factual dispute to require a fact finder to resolve the parties' differing versions of the truth at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

249, 106 S. Ct. 2505, 2510 (1986). If the non-movant fails to make a showing on an element for which he bears the burden of proof, the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986). The evidence must be viewed in a light most favorable to the non-movant. *Id.*

**B. First Question Presented: Mortgage and Note were Bifurcated**

1. The Landmark Case.

Plaintiffs contend that the language contained on page 2 of the Mortgage as described in the Uncontroverted Fact Number 5 purports to cause a security interest to be granted to MERS, rather than to the lender. As such, the Mortgage is held by a different party than the current holder of the Note ("Lender"). This issue was squarely addressed by the Kansas Supreme Court in Landmark National Bank v. Boyd Kesler, Millenia Mortgage Corporation, et. al. 289 Kan 528, 216 P.3d 158 (2009).

The issue before the Court in Landmark was whether the trial court and appellate court properly denied MERS's motions to set aside a default judgment and to intervene as a contingently necessary party. The Kansas Supreme Court in Landmark cited as the primary test for setting aside a default judgment and considering a motion to intervene to be whether MERS could show a meritorious defense to the action or whether it had an interest in the property or transaction at issue. The facts of the Landmark case involved a mortgage instrument that contained language granting a security interest to MERS as nominee for the lender (which was nearly identical to the verbiage used in the Mortgage executed by Plaintiffs in this case.) The Court then analyzed the nature of the relationship between MERS and the lender, what party held the mortgage, and whether

the bifurcation of the mortgage from the note could be a fatal flaw in the mortgage.

The Court in Landmark concluded the following three points:

(a) First, the language in the mortgage granting a security interest to MERS "solely as nominee" for the lender did not constitute a granting of a security interest to MERS as an agent for the lender, but rather, to MERS in a capacity separate and distinct from Lender. *See* Landmark at 165,166. Thus, in Landmark, the Court determined that the security interest was granted to MERS, and not to the lender.

(b) Second, the Court concluded that a mortgagee and lender are inherently required to be one and the same party. The Court provided that:

> A mortgagee and lender have intertwined rights that defy a clear separation of interests, especially when such a purported separation relies on ambiguous contractual language. The law generally understands that a mortgagee is not distinct from a lender: a mortgagee is '[o]ne to whom property is mortgaged: the mortgage creditor, or lender.' Black's Law Dictionary 1034 98th ed. 2004). By statute, an assignment of the mortgage carries with it an assignment of the debt. K.S.A. 58-2323.

Landmark at 166.

(c) Third, the Court concluded that a bifurcation of the security interest from the note it purports to secure whereby the security interest is held by a party independent of the party holding the note, the mortgage becomes unenforceable. *See* Landmark at 166. The Court in Landmark provided that "[i]ndeed, in the event that a mortgage loan somehow separates interests of the note and the deed of trust, with the deed of trust lying with some independent entity, the mortgage may become unenforceable." *Id.* It further noted that "if MERS is only the mortgagee, without ownership of the mortgage instrument, it does not have an enforceable right." *See* Landmark at 167.

In coming to this conclusion, the Court in Landmark quoted a Missouri Appellate

Court case, Bellistri v. Ocwen Loan Servicing, LLC, 284 S.W3d 619, 623 (Mo. App. 2009) as follows:

> The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose, unless the holder of the deed of trust is the agent of the holder of the note. [Citation omitted.] Without the agency relationship, the person holding only the note lacks the power to foreclose in the event of default. The person holding only the deed of trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. [Citation omitted.] The mortgage loan becomes ineffectual when the note holder did not also hold the deed of trust.

*See* Landmark at 167.

Thus, the Court in Landmark concluded that because the language causing MERS to be a nominee for the lender resulted in MERS being a distinct and independent entity from the lender, rather than its agent, the question arose of whether the bifurcation of the deed of trust from the mortgage is a fatal flaw. The Court then concluded that such a bifurcation results in the mortgage being unenforceable. *Id.*

In fact this Court appears to have the same interpretation of this conclusion in Landmark as page 4 of its Memorandum and Order dated September 28, 2010 denying Plaintiffs' Motion to Dismiss MERS cited these same parts of the opinion in Landmark and stating that "[t]he Supreme Court thus held that MERS, as mere nominee, did not have an enforceable right under the mortgage…."

2. Application of Landmark to the Present Case.

The Court in Landmark cited various paragraphs and language of the

mortgage in making its determination that based on such specific language, MERS was not an agent of the lender, but rather a very distinct and independent entity from the lender. Landmark at 164-165. Based on these paragraphs and language, the Court concluded that the mortgage had been bifurcated from the note resulting in the mortgage being unenforceable. Id at 166-167.

The Mortgage executed by the Plaintiffs contains paragraphs and language virtually identical to such paragraphs and language cited by the Court in Landmark. The relevant facts at issue in this case are indistinguishable from the facts cited by the Court in Landmark. The language at issue in the two mortgages is virtually identical.

The Mortgage in this case attempts to grant a security interest to MERS "solely as nominee" for Lender. Further, the Court in Landmark at page 165 cites the following paragraphs of the mortgage at issue in that case:

(a) Opening paragraph of mortgage identifying parties;

(b) Third paragraph of the first page conveying a security interest to MERS as nominee: nearly identical language in last paragraph on page 2 of the Mortgage executed by Plaintiffs;

(c) First paragraph of the second page limits and expands MERS rights: nearly identical language in the first paragraph on page 3 of the Mortgage executed by Plaintiffs;

(d) Paragraph 7 of the mortgage provides lender the right to protect the security: nearly identical language in Paragraph 9 of the Mortgage executed by Plaintiffs;

(e) Paragraph 9 of the mortgage provides lender with rights in the event of condemnation: very similar language in Paragraph 11 of the Mortgage executed by Plaintiffs;

(f) Paragraph 12 of the mortgage addresses notice to Lender: nearly identical language in Paragraph 15 of the Mortgage executed by Plaintiffs;

As such, one can see all of the language in the mortgage that the Court in Landmark relied upon is nearly identical to the language in the Mortgage executed by Plaintiffs. Thus, because the relevant facts of the two cases are nearly the same, the determinations made by the Supreme Court of Kansas are very much applicable to the present case.

As the Court in Landmark found the relationship between MERS to the lender designated as "nominee" to be other than an agency relationship, the same is true in the present case. The mortgage purports to grant a security interest to MERS, not Lender. See Exhibit C at 2. The Mortgage grants Lender rights to protect the security, not MERS. See Exhibit C at 7. The Mortgage grants Lender rights in the event of condemnation, not MERS. See Exhibit C at 8. The Mortgage consistently cites MERS as acting as "nominee" of Lender, rather than as agent. As these factors were sufficient to create a status of MERS separate and distinct from the lender in Landmark, they create a status of MERS separate and distinct from Lender in this case. As in Landmark, because the Mortgage is held by MERS, a party distinct from the Lender who holds the Note, the Mortgage is unenforceable.

3. A Look to Other Jurisdictions' Opinions

As noted above, the Court in Landmark cited the Missouri Appellate Court in Bellistri v. Ocwen Loan Servicing, LLC, 284 S.W.3d 619 (Mo. App. 2009) for the proposition that the mortgage cannot be bifurcated from the Note. *See* Landmark at 167; Jackson v. Mortgage Electronic Registration Systems Inc., 770 N.W.2d 487 (MN 2009). In addition, it cited In re Wilhelm, 407 B.R. 392 (Bankr. D. Idaho 2009), In re Vargas, 396 B.R. 511 (Bankr. C.D. Cal. 2008), Saxton Mortgage Services, Inc. v. Hillery, 2008 WL 5170180 (N.D. Cal. 2008) (unpublished opinion) for the proposition that not only is the mortgage unenforceable if it is bifurcated from the note, but when MERS is not the original holder of the note (as in this case) and is not given authority by the original holder of the note to transfer the note on its behalf, any subsequent assignment by MERS of the note is ineffective. *See* Landmark at 167.

In looking to the opinions of other jurisdictions involving the MERS issue, on June 3, 2010 the United States Bankruptcy Court for the Western District of Missouri issued an order in which it analyzed the MERS issue where the deed of trust held by MERS was assigned. In re Martin Eugene Box and Tamm Jean Box, Case No. 10-20086 (unpublished opinion). The Court quoted many parts of Bellistri including its holding that splitting the note from the mortgage makes it impossible for the holder of the note to foreclose, and thus the mortgage becomes ineffectual. Further, the Court cited Landmark for its analysis of the MERS's legal status as "sole nominee" being other than an agency relationship. In re Martin at FN 15, 16.

In LaSalle Bank National Association v. Lamy, 2006 WL 2251721 at 2

(N.Y. Sup. 2006) the Court said that MERS as nominee of the holder of a note in a mortgage, it could not effectively assign the note because it lacked ownership in the note and mortgage.

4. Conclusion.

MERS holds only legal title to the Mortgage. *See* uncontroverted fact no. 11. Lender holds the Note. *See* Exhibit A. MERS is not the agent of Lender with respect to the Mortgage for the reasons set forth herein. As such, a bifurcation exists between the Mortgage and the Note. Because of such bifurcation, the Mortgage is unenforceable. Landmark at 166-167; Bellistri, at 623;

**C. Second Question Presented: Mortgage Fails to Identify the Note**

The Mortgage purports to secure a loan that does not exist. It provides "[t]his Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals…." *See* Exhibit C at 2. The term is "Loan" is defined as "the debt evidenced by the Note, plus interest…." *See* Exhibit C at 2. The term is "Note" is defined as "the promissory note signed by Borrower and dated March 23, 2007." *See* Exhibit C at 1. The term "Borrower" is then defined as "Troy D. Renkemeyer and Susan M. Renkemeyer Husband and Wife as Joint Tenants." Thus, the debt that the Mortgage purports to secure is a debt issued by "Troy D. Renkemeyer and Susan M. Renkemeyer Husband and Wife as Joint Tenants" dated March 23, 2007. No such debt exists. However, a debt was executed solely by Troy Renkemeyer on such date.

A mortgage must identify the debt that it purports to secure. K.S.A 58-2303. Emporia State Bank and Trust Company v. Harold L. Mounkes, 214 Kan. 178, 519 P.2d

618 (1974). The Court in Emporia State Bank stated that "... mortgages, by the use of general terms, ought never to be so extended as to secure debts which the debtor did not contemplate." Id. at 621. It quoted National Bank of Eastern Arkansas v. Blankenship, D.C., 177 F.Supp. 667, 673 in that '[t]he 'other indebtedness' secured by a mortgage may be either antecedent or subsequent. Where it is antecedent, it must be identified in clear terms...." The Mortgage in this case fails to identify the Note as a debt for which it secures. As such, the Note is not secured by the Mortgage.

1. Parole Evidence

No ambiguity exists in the Mortgage. The terms Loan, Note, and Borrower are clearly unambiguously defined. The language of the Mortgage unambiguously describes a promissory note that it purports to secure as one executed by "Troy D. Renkemeyer and Susan M. Renkemeyer Husband and Wife as Joint Tenants," even though such debt does not exist. If a reader of the Mortgage was unaware that such debt did not exist, the reader would have no question in its mind as to what debt was intended to be secured by the Mortgage. This illustrates that no ambiguity in the plain reading of the Mortgage exists.

As such, parole evidence cannot be used to interpret the meaning of the words in the contract. The Kansas Supreme Court provides that "if the language of a written instrument is clear and can be carried out as written, there is no room for the rules of construction." J. Richard Godfrey v. Peggy Chandley , 248 Kan. 975, 811 P2.d 1248 (1991) (*citing* In re Living Trust of Huxtable, 243 Kan. 531, 534, 757 P.2d 1262 (1988); M.M. Williams v. Safeway Stores, Incorporate, 198 Kan. 331, 424 P.2d 541 (1967). The Kansas Supreme Court also provides that

> [t]o be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning.

Farm Bureau Mutual Insurance Company, v. Old Hickory Casualty Insurance Company, 248 Kan. 657, 810 P.2d 283 (1991).

Determining whether a written contract is free from ambiguity is a matter of law to be decided by the Court. J. Richard Godfrey v. Peggy Chandley , 248 Kan. 975, 811 P2.d 1248 (1991) (*citing* Mobile Acres, Inc. v. Kurata, 211 Kan. 833, 839, 508 P.2d 889 (1973); First National Bank of Hutchinson v. C.E. Kaiser, 222 Kan. 274, 564 P2.d 493 (1977) (*citing* Craig v. Hamilton, 213 Kan. 665, 518 P.2d 539.)

Cenlar asserts as a defense that the intent of the parties by the mortgage was to grant a security interest to the Lender to secure the Note. However, the intent of the parties in the Mortgage must be determined solely from the four corners of the document. The intent of the parties derived solely from the four corners of the Mortgage was that a security interest was to be granted to secure a debt obligation executed by "Troy D. Renkemeyer and Susan M. Renkemeyer Husband and Wife as Joint Tenants." The four corners of the Mortgage does not illustrate an intent to grant a security interest to secure a debt of only "Troy D. Renkemeyer." In fact, nowhere in the Mortgage is such a debt referenced.

Extrinsic evidence of intent cannot come from any source other than the four corners of the Mortgage. The Court in Godfrey provides that if the words of the contract themselves creates no ambiguity, the intent of the parties in the contract must be

interpreted solely from the words of the Mortgage. *See also* Roy Borgen v. Bill Wiglesworth, 189 Kan. 261, 369 P.2d 360 (1962) (*stating* "when the terms of a lease are plain and unambiguous the meaning must be determined by its contents alone and words cannot be read into the agreement which import an intent wholly unexpressed when it was executed.)"

The Missouri Supreme Court in Ethridge v. Tierone Bank, 226 S.W.3d 127 (Mo 2007) held that the intent of the parties shall only come from the language within the four corners of the deed of trust unless ambiguity in the plain reading of the language justifies the use of parole evidence. In Ethridge, even though an extensive amount of extrinsic evidence existed showing an intent of the parties that differed from the intent made clear from the plain language of the deed of trust, the Court held such extrinsic evidence was not to be considered in the interpretation of the deed of trust. In Ethridge, a husband and wife held a property as joint tenants. A deed of trust was executed by the husband to the lender. The granting language of the deed of trust included only the name of the husband. However, the wife initialed each page of the Deed of Trust and signed the last page of the deed of trust. Even in the presence of the evidence contained within the four corners of deed of trust of the intent of the wife to grant a security interest (i.e. initialing each page and signing the last page), the Court found that the proper granting of a security interest was not present because the plain language of the granting provision only included the husband's name.

Because it is clear and unambiguous that the intent of the parties was for the Mortgage to secure a debt of Troy D. Renkemeyer and Susan M. Renkemeyer Husband and Wife as Joint Tenants, when considering only the plain language of the Mortgage,

extrinsic evidence of intent cannot be considered. Within the definition of the "Borrower" in the Mortgage, the words "Troy D. Renkemeyer and Susan M. Renkemeyer Husband and Wife as Joint Tenants" were typed in the space provided, whereas the remaining portion of the definition was preprinted. Exhibit C. Because of the special attention required to manually draft and identify this as the debt that the Mortgage secures, the intent of the parties when considering the plain language of the Mortgage is made more clear.

2. Importance of Technicalities in Instruments Involving Real Property

A necessity exists for the properly execution of deeds, mortgages, deeds of trust, and other instruments involving real property. The technicalities must be followed. Without the proper execution of such financial instruments, the determination of who holds true and accurate deeds to property, and the management of the existence of liens and lien priority would be impossible.

In Putnam v. Ferguson, 502 S.E.2d 385, 388 (N.C. Ct. App. (1998), the Court found that a deed of trust was invalid because it identified a promissory note executed by one person, although two people actually executed the promissory note. As such, it determined the debt was not properly identified. Although the amount of the debt was accurate, the date was accurate, the identity of owner of the property granting the security interest was accurate, the fact that an error existed in the reference to who executed the promissory note caused the deed of trust to be invalid. The only difference in the facts in Putnam and this case is that the mortgage identifies a note executed by two people, rather than one person. However, the point was an error in identifying the two people rather

than one person as debtors when only one exists is a fatal error that invalidates the mortgage.

In In Re Foreclosure of Deed of Trust of Enderle, 431 S.E.2d 549 (N.C. Ct. App. 1993) the Court found that a deed of trust was invalid because it identified the wrong debtors. The Enderles executed a security interest in their property to secure a debt of a third party. However, the deed of trust stated it was a securing a debt of the Enderles. Again, although the amount of the debt was accurate, the date was accurate, the identity of owner of the property granting the security interest was accurate, the fact that an error existed in the reference to who executed the promissory note caused the deed of trust to be invalid.

The Missouri Supreme Court in Ethridge v. Tierone Bank, 226 S.W.3d 127 (Mo 2007) held that a deed of trust was invalid because the granting provision within the deed of trust contained only the husband's name, rather than the husband and wife's name, even though the wife initialed every page and signed the signature page of the document.

The United States Bankruptcy Court in In Re Head Grading Co. 353 B.R.122 (Bankr. E.D.N.C. 2006) held that a deed of trust that purported to grant a security interest to secure a promissory note was invalid because it identified the promissory note as a note that was executed one day prior to the actual date of the execution of the promissory note. Because the deed of trust referenced a note that was executed one day earlier than the actual date that the note, the deed of trust was invalid, although it properly identified the borrower, amount, etc.

3. Conclusion.

Because the Mortgage identifies a debt to which it purports to secure as a promissory note executed by "Troy D. Renkemeyer and Susan Renkemeyer Husband and Wife as Joint Tenants," and no such promissory note exists, the Mortgage fails to identify an existing debt to which it secures. As such, the Mortgage fails to secure the Note.

Not only is this the accurate legal conclusion, but also an equitable conclusion because it was the negligence of the Lender in its drafting of the Mortgage and Note that resulted in the fatal flaw in the Mortgage. *See* Exhibit D. Further, it is a long-time tradition that defects of Mortgages be construed in favor of the mortgagor and against the Mortgagee. See Emporia State Bank and Trust. The technicalities are vital with respect to financial instruments dealing with real property. Without such technicalities, the management of our deed and lien system would be chaos. Further, the obligation of Plaintiff to pay the debt pursuant to the terms of Note would not be affected by the mortgage being held unenforceable. As stated above, Plaintiff remains current on its obligations of the Note. *See* Exhibit D.

**WHEREFORE,** Plaintiffs respectfully request this Court to grant their Motion for Summary Judgment whereby it declares the Mortgage unenforceable and orders Defendants to file a satisfaction of mortgage with the Johnson County Register of Deeds.

Date: 10/3/10

Respectfully submitted,

Troy Renkemeyer, KS Bar #17913
RCW LAW FIRM LP
10975 Benson Drive, Suite 570
Overland Park, KS 66210
Phone: (913) 906-9810
Fax: (913) 906-9840
trenkemeyer@rcwlawfirm.com
ATTORNEY FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, October 3, 2010, the foregoing document was electronically filed with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Patrick A. McInerney
Steven M. Aaron
Hush Blackwell Sanders LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
pat.mcinerney@huschblackwell.com
steve.aaron@huschblackwell.com
ATTORNEYS FOR DEFENDANT
MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.

Andrew D. Ryan
Sandberg, Phoenix & von Gontard, P.C.
600 Washington Avenue, 15th Floor
St. Louis, MO 63101-1313
aryan@sandbergphoenix.com
ATTORNEYS FOR DEFENDANT
CENTRAL LOAN ADMINISTRATION
& REPORTING

Troy Renkemeyer

EXHIBIT "A"

MIN: 100085000000138285 Loan Number: 07002297

# INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE

## (One-Year LIBOR Index (As Published In *The Wall Street Journal*) Rate Caps - 10 Year Interest Only Period)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

| MARCH 23, 2007 | OVERLAND PARK | KANSAS |
|---|---|---|
| [Date] | [City] | [State] |

14554 SHERWOOD RD, Overland Park, Kansas 66224
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 1,600,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is PEOPLES BANK, A KANSAS CORPORATION.
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.375 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will make a payment on the 1st day of every month, beginning on MAY 1, 2007. Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on APRIL 1, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 7579 W. 151st STREET, OVERLAND PARK, KANSAS 66223 or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 8,500.00 until the first Change Date. After the first Change Date, my monthly payment will be in an amount sufficient to pay accrued interest, at the rate determined as described in Section 4 of this Note until the First Principal and Interest Payment Due Date. On that date and thereafter, my monthly payment will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of changes in monthly payment.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the 1st day of APRIL, 2017, and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding ONE AND 875/1000 percentage points ( 1.875 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.375 % or less than 1.875 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than TWO AND 000/1000 percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.375 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(G) Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

## 5. BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Note Addendum.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) **Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____________________ (Seal)
TROY D. RENKEMEYER -Borrower

_____________________ (Seal)
-Borrower

_____________________ (Seal)
-Borrower

_____________________ (Seal)
-Borrower

_____________________ (Seal)
-Borrower

_____________________ (Seal)
-Borrower

*[Sign Original Only]*

Loan Number: 07002297

# PREPAYMENT CHARGE ADDENDUM
# FIXED/ADJUSTABLE RATE NOTE

THIS PREPAYMENT CHARGE ADDENDUM is made this 23rd day of MARCH, 2007 , and is incorporated into and shall be deemed to amend and supplement the Fixed/Adjustable Rate Note (the "Note") and the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Note to PEOPLES BANK, A KANSAS CORPORATION
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
14554 SHERWOOD RD, Overland Park, Kansas 66224

**THIS ADDENDUM SUPERSEDES Section 5 of the Note. None of the other provisions of the Note are changed by this addendum.**

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

If I make any Prepayments on or before the THIRTY-SIXTH (36TH ) scheduled payment date, I will pay a Prepayment charge of TWO percent ( 2.000 %) of the amount prepaid on each Prepayment. Thereafter, I may make a full Prepayment or partial Prepayment without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Charge Addendum.

_______________________ (Seal)
TROY D. RENKEMEYER -Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower



DocMagic eForms 800-649-1362
www.docmagic.com

Loan Number: 07002297

# ADJUSTABLE RATE RIDER

## (LIBOR One-Year Index (As Published In *The Wall Street Journal*)-Rate Caps-Ten-Year Interest Only Period)

THIS ADJUSTABLE RATE RIDER is made this 23rd day of MARCH, 2007 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ( the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to PEOPLES BANK, A KANSAS CORPORATION

(the "Lender")

of the same date and covering the property described in the Security Instrument and located at:

14554 SHERWOOD RD, Overland Park, Kansas 66224

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of 6.375 %. The Note provides for changes in the interest rate and the monthly payments as follows:

### 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the 1st day of APRIL, 2017 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding ONE AND 875/1000 percentage points ( 1.875 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.375 % or less than 1.875 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than TWO AND 000/1000 percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.375 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

| | |
|---|---|
| _______________ (Seal)<br>TROY D. RENKEMEYER -Borrower | _______________ (Seal)<br>SUSAN M RENKEMEYER -Borrower |
| _______________ (Seal)<br>-Borrower | _______________ (Seal)<br>-Borrower |
| _______________ (Seal)<br>-Borrower | _______________ (Seal)<br>-Borrower |

# EXHIBIT "B"

Thornburg Mortgage

CENLAR
CENTRAL LOAN ADMINISTRATION & REPORTING

June 11, 2010

TROY RENKEMEYER
14554 SHERWOOD RD
OVERLAND PARK KS 66224

RE: Loan Number: 0018975318

Dear Customer:

We are writing to you today to share some important information concerning your mortgage serviced by TMST Home Loans, Inc. FKA Thornburg Mortgage Home Loans, Inc. **Effective May 14, 2010**, the servicing of your mortgage loan (that is, the right to collect payments from you) has been transferred from TMST Home Loans, Inc. FKA Thornburg Mortgage Home Loans, Inc. to Central Loan Administration & Reporting. TMST Home Loans, Inc. FKA Thornburg Mortgage Home Loans, Inc. stopped accepting payments from you on **May 13, 2010**. Central Loan Administration & Reporting started accepting payments from you on **May 14, 2010**.

**Please note that the transfer of the servicing of your mortgage loan does not change any term or condition of your mortgage instruments other than those directly related to the servicing of your loan.**

Except in limited circumstances, the law requires that your present servicer send you a notice at least 15 days before the effective date of transfer. As your new servicer, we must also send you a notice no later than 15 days after this effective date. In this case, all necessary information is combined in this one notice.

Here is some important information about your mortgage:

- Your mortgage account number **will not** change.
- Your payment mailing address **will remain** as follows:

| Correspondence Address | Payment Address | Qualified Written Request |
|---|---|---|
| P.O. Box 77404 | P.O. Box 986 | P.O. Box 77423 |
| Ewing, NJ 08628 | Newark, NJ 07184-0986 | Ewing, NJ 08628 |

- Beginning May 14, 2010, all payments should be made payable to "Central Loan Administration & Reporting".
- You will receive a monthly statement under separate cover. Please continue to make your payments indicating your loan number on the check until your monthly statement is received. If your mortgage payment is currently being drafted by TMST Home Loans, Inc. FKA Thornburg Mortgage Home Loans, Inc. this service **will not** be affected by the change. If you would like to begin using our automatic deduction service, please contact your new servicer's Customer Service Department for the authorization form. When you select this option you have the added convenience of picking your payment date (the first, fifth or tenth of each month). **Because of the required lead time to set up automatic deduction it will be necessary for you to continue to make your monthly mortgage payments in the manner you have been accustomed to until you receive a letter confirming the start date of your automatic deduction.**
- After May 14th, please contact your agent or insurance company and confirm that the "mortgagee" clause on your insurance policy has been updated to read: Central Loan Administration & Reporting, ISAOA, ATIMA, P.O. Box 202028, Florence, SC 29502.

EXHIBIT "C"

[Space Above This Line For Recording Data]

Loan Number: 07002297

# MORTGAGE

MIN: 100085000000138285

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "**Security Instrument**" means this document, which is dated MARCH 23, 2007, together with all Riders to this document.

(B) "**Borrower**" is TROY D. RENKEMEYER AND SUSAN M RENKEMEYER HUSBAND AND WIFE AS JOINT TENANTS

Borrower is the mortgagor under this Security Instrument.

(C) "**MERS**" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "**Lender**" is PEOPLES BANK.

Lender is a KANSAS CORPORATION organized and existing under the laws of KANSAS.
Lender's address is 7579 W. 151st STREET, OVERLAND PARK, KANSAS 66223.

(E) "**Note**" means the promissory note signed by Borrower and dated MARCH 23, 2007.
The Note states that Borrower owes Lender ONE MILLION SIX HUNDRED THOUSAND AND 00/100
Dollars (U.S. $ 1,600,000.00 ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than APRIL 1, 2037.

(F) "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | |
|---|---|
| [X] Adjustable Rate Rider | [X] Planned Unit Development Rider |
| [ ] Balloon Rider | [ ] Biweekly Payment Rider |
| [ ] 1-4 Family Rider | [ ] Second Home Rider |
| [ ] Condominium Rider | [ ] Other(s) [specify] |

(I) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "**Escrow Items**" means those items that are described in Section 3.
(M) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(Q) "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower mortgages and warrants to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the COUNTY of JOHNSON :

[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]

LOT 253, PAVILIONS OF LEAWOOD, 6TH PLAT, A SUBDIVISION IN THE CITY OF LEAWOOD, JOHNSON COUNTY, KANSAS, ACCORDING TO THE RECORDED PLAT THEREOF.
A.P.N.: HP91400000 0253

which currently has the address of 14554 SHERWOOD RD [Street]

Overland Park [City], Kansas 66224 [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be

applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make

such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of

any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security

Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the

Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, costs of title evidence.**

**Lender shall be entitled to collect all reasonable expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees, to the extent allowed by Applicable Law.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Redemption.** Borrower waives all rights of redemption to the extent allowed by law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_______________________ (Seal)
TROY D. RENKEMEYER -Borrower

_______________________ (Seal)
SUSAN M RENKEMEYER -Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

Witness:

_______________________

Witness:

_______________________

[Space Below This Line For Acknowledgment]

State of Kansas )

County of JOHNSON )

This instrument was acknowledged before me on MARCH 23, 2007

by TROY D. RENKEMEYER AND SUSAN M RENKEMEYER

Signature of notarial officer

Title

(Seal) My commission expires:

After Recording Return To: PEOPLES BANK
7579 W. 151st STREET
OVERLAND PARK, KANSAS 66223

EXHIBIT "D"

United States District Court
For the
District of Kansas

| | |
|---|---|
| Troy D. Renkemeyer and Susan M. Renkemeyer Husband and Wife as Joint Tenants, Plaintiff | ) |
| v. | ) Civil Action No. 10-CV-2415 JWL/DWB |
| Mortgage Electronic Registration Systems, Inc. And Central Loan Administration & Reporting, Defendants | ) |

**AFFIDAVIT OF SUSAN M. RENKMEYER**

COMES NOW Susan M. Renkemeyer, being duly sworn upon her oath and states as follows for her affidavit:

1. I am over 18 years of age, am of sound mind and body, and am otherwise competent to make this affidavit.

2. I have personal knowledge of the matters set forth herein and am competent to testify to the matters set forth herein.

3. I did no execute on my behalf or as a joint tenant with Troy D. Renkemeyer, or in any other capacity, a promissory note issued to any party dated March 23 2007.

4. The mortgage executed by me on March 23, 2007 was drafted by Peoples Bank.

5. Payment obligations on the promissory note issued by Troy D. Renkemeyer dated March 23, 2007 to Peoples Bank are current.

**IN WITNESS WHEREOF**, Affiant has caused this Affidavit to be signed this 2ND day of October, 2010.

Susan Renkemeyer

Susan Renkemeyer

Subscribed and sworn to before me this 2ND day of October, 2010.

Susan L Ule

Notary Public

My commission expires:

12/7/2010

NOTARY PUBLIC STATE OF KANSAS
SUSAN L. ULE
NOTARY PUBLIC
STATE OF KANSAS
My App. Exp 12/7/2010